This memorandum opinion was not selected for publication in the New Mexico Reports.  Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**


**STATE OF NEW MEXICO**,

    Plaintiff-Appellee,

v.                         **NO.  27,988**

**GERALD ZIMMERMAN**,

    Defendant-Appellant.


**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Thomas J. Hynes, District Judge**


Gary K. King, Attorney General
Santa Fe, NM
M. Anne Kelly, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Navin H. Jayaram, Assistant Appellate Defender
Santa Fe, NM

for Appellant


**MEMORANDUM OPINION**

**ROBLES, Judge.**

Gerald Zimmerman (Defendant) appeals his conviction for criminal sexual penetration (CSP) in the first degree. The judgment and sentence was filed on July 24, 2007. Defendant timely filed a notice of appeal on August 20, 2007. As discussed in this Opinion, we affirm Defendant's conviction.

## I. FACTUAL BACKGROUND

Officer Derrick Mohler was called to investigate a claim of CSP involving an eight-year-old child, D.D. (Victim). Officer Mohler first spoke with Victim's mother and then conducted a detailed interview of Victim. Victim stated that, on August 5, 2006, she was invited to a barbecue and to stay overnight at the home of a young girl she met during a summer program. The girl, C.B., is Defendant's step-daughter. After the barbecue, everyone watched a movie, during which time, Victim and C.B. sat on Defendant's lap. That night, Victim slept in the same twin bed as C.B. Victim was awakened in the night when she felt someone taking off her pants and underpants and licking her private area. Victim recognized the person as Defendant. She told Defendant to stop, and he did. Victim stated that Defendant said he was sorry and told her repeatedly not to tell anyone about the incident or else he would go to prison. Victim stated that Defendant left the room and came back with one of the family cats and left it with her. When she awoke the next morning, she was not sure if she had been dreaming until she saw the cat in the bed.

2

Defendant was tried on May 22, 2007. The jury found Defendant guilty of CSP of a child under thirteen years of age in violation of NMSA 1978, Section 30-9-11(C)(1) (2003) (amended 2009). Defendant appeals.

**II.    DISCUSSION**

As an initial matter, we express a point of concern. The names of the two children in this case were used in briefing to this Court. Although we are not aware of a specific rule that prevents the parties from using children's names in adult proceedings, we nonetheless express our concern about publically identifying minors who are or may have been victims of assault. N.M. Const. art. II, § 24(A) (applying victims' rights to cases involving criminal sexual penetration, criminal sexual contact of a minor, and child abuse); *State v. Fry*, 2006-NMSC-001, ¶ 3 n.1, 138 N.M. 700, 126 P.3d 516 (filed 2005) ("We do not refer to the victim by name out of respect for her dignity and privacy."). The New Mexico Constitution guarantees "respect for the victim's dignity and privacy throughout the criminal justice process." N.M. Const. art. II, § 24(A)(1). Attorneys in this state should refrain from alluding to matters that are not reasonably relevant to the case at bar or that are unnecessary for fair representation and may embarrass a third party. *See* Rule 16-304(E) NMRA; Rule 16-404(A) NMRA. We strongly suggest that in briefs to this Court, counsel use a minor child's initials or other appropriate abbreviation whenever capable of doing so.

Defendant raises three issues on appeal: (1) whether the district court erred in denying his motion for continuance filed on May 11, 2007; (2) whether the district court erred in denying his motion for continuance filed on May 21; and (3) whether there was sufficient evidence to support the conviction. We address the issues below.

**A. Motions for Continuance**

Defendant contends that the district court abused its discretion when it denied his motions for continuance filed on May 11 and 21, 2007. In order to address Defendant's claims, we first review events essential to our decision.

A criminal information was filed in magistrate court on August 28, 2006. Defendant's first attorney, Cosme Ripol, filed an entry of appearance on September 6. Approximately one month later, on October 5, the criminal information was filed in district court, charging Defendant with CSP of a minor and bribery of a witness. The State filed its certificate of compliance with disclosure and its witness list on November 21. On January 16, 2007, the State filed a stipulated motion for continuance of the pretrial conference set for January 29. The motion was denied. On January 24, Ripol moved to withdraw, claiming that his relationship with Defendant was irrevocably broken. The district court granted the motion and allowed twenty days for Defendant to secure new counsel or be deemed to represent himself pro se.

4

Three different attorneys entered appearance on behalf of Defendant between January 24 and March 5, 2007. Defendant's second attorney, Rick Tedrow, entered appearance on January 30. Defendant's third attorney, Overzenia Ojuri, entered appearance on February 16. At a conference held on February 26, the district court stated that the parties would need to keep it informed about any discovery problems. The district court made it clear that it did not want to run into claims of discovery problems after setting the trial date and that because the parties would get a long "lead on it," it was not going to grant any continuance. Ojuri assured the court that no continuance would be needed and stated that the defense witnesses would not include medical personnel.

Defendant's fourth and final trial attorney, Geoffrey Scovil, entered appearance on March 5, 2007, and, on March 8, filed a notification that the State had not provided discovery. On that same date, Scovil filed a motion to continue the final pretrial conference scheduled for March 12. In the motion, Scovil claimed that he had received no discovery materials, had no knowledge about the grounds for the charge of bribery of a witness, was unfamiliar with the case, and was already scheduled for a number of other hearings or interviews on March 12. Scovil acknowledged that the time period under Rule 5-604 NMRA would run on April 16. On March 9, the State

filed a stipulated petition for a ninety-day extension of time in which to try Defendant. An extension was granted to July 16.

The March 12, 2007 hearing was held as scheduled. At the hearing, the district court expressed frustration with the fact that multiple attorneys had entered appearance on behalf of Defendant and suggested to Scovil that a trial date of May 22, over two months away, was sufficient time for him to prepare for trial. Trial was set for May 22.

**1.     First Motion for Continuance**

On May 11, 2007, Scovil moved to continue trial to "no earlier than July." He argued that he had been in contact with Defendant's prior attorneys and had been promised materials, but had not yet received them. He acknowledged that he received information regarding an investigation by a private firm. However, he claimed that he had not received a taped interview of C.B., an item that he presumed was in Ripol's possession. In addition to the missing interview, Scovil claimed that he had received a report on May 2 from an expert that Defendant had seen, but he would not identify the expert or divulge anything in the report due to confidentiality and privacy rights. Finally, Scovil claimed that he had recently been given permission to contract with Dr. Moss Aubrey to conduct an evaluation of Defendant. Scovil asserted that Dr. Aubrey's report would be ready on June 10 and asked for a continuance until one

week after the report was produced. He stipulated to any necessary rule extension. Scovil attached a note from Dr. Aubrey, indicating that evaluation of Defendant was initiated on May 8.

At the hearing on the motion held on May 15, 2007, the district court informed Scovil that it had Ripol's office fax a copy of the transcript of C.B.'s interview and that the tape of the interview could be sent overnight to Scovil. The district court stated that it was not willing to wait for Dr. Aubrey's report because it was not clear what evidence would be included in the report or what evidence would be admitted at trial and told the parties that he would not allow the admission of "profiling" evidence. The court suggested that a teleconference could be set up to allow Dr. Aubrey to testify, but Scovil asserted that the doctor would be on vacation on the day of trial. The court then suggested that Dr. Aubrey could be videotaped, or Scovil could send the court an ex parte statement that would be sealed, informing him about the anticipated testimony from the doctor. Defense counsel responded that he thought that was "a fair avenue" and thanked the court for "the opportunity to supplement things in that manner." The district court indicated that the trial date would have to be changed if the ex parte statement led to a determination that the Dr. Aubrey's testimony would be admitted. Defendant did not submit an ex parte statement to the district court.

## 2.    Second Motion for Continuance

On May 21, 2007, defense counsel filed a second motion to continue the trial. He claimed that he had spent a number of weeks trying to "obtain full discovery," but was unable to secure Dr. Aubrey's "conclusive analysis" of the evaluation of Defendant, and Dr. Aubrey had not finished preparing the full report on Defendant. Defense counsel also claimed that he had recently read a Court of Appeals opinion that indicated to him that he could use testimony from Dr. Jude Pardee regarding the possibility that a child might be influenced to falsely accuse someone of sexual abuse. He asked for trial to be reset after he was able to contact Dr. Pardee or "a similarly qualified expert," and he agreed to any necessary rule extension.

At the hearing on the motion, the State argued that there was no legitimate basis for presenting "taint testimony or suggestibility testimony," and the authorities relied on by defense counsel involved children much younger than Victim. The State contended that, unlike the cases cited to by defense counsel, the situation in this case does not involve custody, antagonism, or family relationship. The State also informed the district court that it had four witnesses ready to appear at trial the next day. The district court explained that he believed testimony from Dr. Pardee or a similar expert would amount to a comment on the veracity of another witness. The court pointed out that Defendant had been seen by Dr. Aubrey, and yet nothing had been provided to

8

the court to show that Dr. Aubrey's testimony would be admissible at trial. The court also noted that the second motion to continue the trial was for purposes of securing another expert that had never seen Defendant. The motion was denied.

**3.    Analysis**

It is within the district court's discretion to grant or deny a motion for continuance, and it is the defendant's burden to show that the district court abused its discretion and that he was prejudiced as a result. *See State v. Nieto*, 78 N.M. 155, 157, 429 P.2d 353, 355 (1967). We will not say that the court abused its discretion unless the court's ruling can be characterized as clearly untenable or not justified by reason. *See State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (filed 1998).

> There are a number of factors that trial courts should consider in evaluating a motion for continuance, including the length of the requested delay, the likelihood that a delay would accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the parties and the court, the legitimacy of the motives in requesting the delay, the fault of the movant in causing a need for the delay, and the prejudice to the movant in denying the motion.

*State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20.

When the first motion for continuance was filed, the time for bringing Defendant to trial had been extended to July 16, 2007. Three defense attorneys had come and gone before Defendant's trial counsel entered his appearance on March 5.

Trial was set for May 22, allowing defense counsel over two months to prepare. Defense counsel had previously argued that the case was complicated, but did not explain what made the case complicated, except to say that his client was facing a long prison sentence. For unknown reasons, defense counsel did not receive approval to hire Dr. Aubrey until approximately six weeks after counsel entered his appearance, and Dr. Aubrey did not begin to evaluate Defendant until May 8, only two weeks prior to trial. Three days after Dr. Aubrey began his evaluation defense counsel asked to continue the trial so that Dr. Aubrey could complete his report of Defendant. At the hearing, defense counsel refused to provide any information about Dr. Aubrey's anticipated testimony and did not provide the court with that information despite a guarantee that the information would remain confidential. The district court was therefore provided with no information as to the importance of Dr. Aubrey's testimony to the defense.

In sum, the case had been continued one time. *See id.* (including existence of previous continuances in factors to consider on review of the denial of a motion for continuance). The district court was given no information regarding evidence that might be introduced through Dr. Aubrey. Therefore, we cannot say that Defendant's objectives would have been accomplished by granting a continuance. *See id.* (considering whether delay would likely accomplish movant's objectives). In

10

addition, because the first motion for continuance was filed only eleven days prior to trial, the degree of inconvenience to the State in granting a continuance would not have been insignificant. *See id.* (stating that the degree of inconvenience to the parties is a factor to consider on review of denial of a continuance). We conclude that the district court did not err in refusing to grant Defendant's first motion for continuance.

The second motion for continuance again mentions that defense counsel had not yet received Dr. Aubrey's report, an argument that we have addressed above. However, the motion is primarily based on the possibility of retaining a different expert to testify at trial. Defense counsel requested that trial be rescheduled so that he could retain Dr. Pardee or another expert to testify about why children might fabricate claims of sexual abuse and about the possibility that outside influences might impact reports of sexual abuse by children.

Included in the motion are a number of allegations regarding the difficulties faced by Victim prior to the incident in this case. First, we note that defense counsel made many assumptions that are not supported by the record that was before the district court. For example, he alleged that (1) Victim was "suffering through a divorce in her family" and "apparently" lacked a father figure; (2) Victim's care was "in flux" due to her aunt moving into her home; (3) Victim had "not been getting

along particularly well" with C.B., making Defendant a "convenient target" for accusation; (4) the school year was about to begin and Victim was "in trouble" with her aunt for not picking up toys when she made the accusations; and (5) Victim's mother "had instilled" in her at a young age that she might be touched inappropriately and, on the night of the incident, Defendant was chastised by his wife within earshot of Victim for having C.B. and Victim sit on his lap. With respect to each claim, defense counsel stated that, "in the experience of defense counsel, [the alleged difficulty is] a risk factor for false accusation by children." Defense counsel conceded that he was presenting only argument, but asked that he be able to present expert testimony instead to support Defendant's claim that he was falsely accused, and the false accusations were "the product of a number of situational factors impacting his accuser." *See State v. Cochran*, 112 N.M. 190, 192, 812 P.2d 1338, 1340 (Ct. App. 1991) ("Argument of counsel is not evidence."). A hearing on the motion was held the day before trial. The motion was denied, but the district court agreed that, if defense counsel could bring Dr. Pardee to court the next day, they would "have the same hearing that we are now [having]."

Defense counsel did not bring Dr. Pardee to court. Instead, he filed an addendum to the motion to continue, in which he related an alleged conversation that he had with Dr. Pardee. He reported that Dr. Pardee agreed to consult with him about

the case, but could not proceed under oath until she reviewed the case materials. He claimed that Dr. Pardee was concerned about the "multiple interviewing" of Victim and that the interview prior to the "forensic interview" was "'suspicious' and likely indicative of some degree of suggestibility." He stated that "Dr. Pardee felt that this case does indeed present 'possibly fertile ground' for an inquiry into the effects of suggestibility."

In the motion, defense counsel primarily relied on a case in which Dr. Pardee was allowed to testify on the subject of fabrication of sexual abuse and outside influences leading to fabrication. *See State v. Campbell*, 2007-NMCA-051, 141 N.M. 543, 157 P.3d 722. In *Campbell*, the defendant's theory of defense was that the child's mother, who was deceased at the time of trial, "had induced the child to lie about being abused to facilitate [the defendant's] exit from her life." *Id.* ¶ 3. This Court noted that the child gave conflicting accounts of the incident, and the child's mother was no longer available for examination "as to her explanations for the statements overheard by [the d]efendant and others, or her possible motives in making them." *Id.* ¶ 20. The defendant wished to call Dr. Pardee to testify about circumstances under which a child victim claiming sexual abuse "might inaccurately report experiences," or have distorted memories of an event due to "outside factors and experiences." *Id.* ¶ 2. Dr. Pardee was not going to testify whether an act of abuse

occurred or whether the child's mother did or did not induce the child to lie. *Id.* ¶ 11. This Court concluded: "To the extent that the defense hinged its case on the assertion that the child was coerced into making statements by his mother, we hold that due process required the district court to allow the defense to make its case, with Dr. Pardee's testimony as a part." *Id.* ¶ 17.

In this case, Defendant had not retained Dr. Pardee at the time of the hearing, he did not know if she would agree to testify, and he had no information regarding the testimony she might give relating to this case. The addendum indicates that Dr. Pardee had not yet read any of the case materials before she talked with defense counsel and, instead, relied on counsel's interpretation of the case. Again, the district court was provided with no information as to what testimony the expert would give at trial. Based on the holding of *Campbell*, an expert would only be able to testify generally about reasons that children might fabricate a story of abuse and would not be able to testify about the particular allegations made by defense counsel regarding the victim's circumstances. Like the situation in *Campbell,* Defendant wanted to show that Victim's account was fabricated, but unlike the situation in *Campbell*, Victim's aunt and mother were available for examination at trial, and Defendant made no showing that Victim gave conflicting accounts of the incident. The circumstances in this case are quite different from those in *Campbell*, and we hold that the district

14

court did not abuse its discretion by denying Defendant's last minute motion for a continuance to allow additional time to determine whether the testimony of a new expert witness was appropriate under these particular circumstances.

Defendant also argues that this case is similar to *State v. Stefani*, 2006-NMCA-073, 139 N.M. 719, 137 P.3d 659, in that Defendant had a number of attorneys, and he was therefore left with less time to prepare for trial, and the case is "inherently complex," requiring the opinion of an expert witness to assist in the defense. Again, the circumstances in *Stefani* were very different from those in this case. The defense attorney in *Stefani* was appointed less than five weeks prior to trial. Almost a dozen witnesses, including the co-defendant, had not been interviewed in the complex, drug-trafficking case. Photographic and videotape evidence had not been reviewed, and the state was also concerned about the preparedness of the defense attorney. *Id.* ¶¶ 12-13. On the other hand, in this case, defense counsel had over two months to prepare for trial, including securing any necessary experts, and other than the long prison sentence that Defendant faced, defense counsel presented nothing to show that the case was "inherently complex." We conclude that the district court's denial of the second motion for continuance cannot be characterized as clearly untenable or not justified by reason. *See Rojo*, 1999-NMSC-001, ¶ 41. The district court did not abuse its discretion.

## B. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his conviction for first-degree CSP. In order to convict Defendant, the jury was required to find that, on or about August 5, 2006, Defendant caused Victim, a child under the age of twelve, to engage in cunnilingus by the "touching of the edge or inside of the female sex organ with the lips or tongue."

> Substantial evidence review requires analysis of whether direct or circumstantial substantial evidence exists and supports a verdict of guilt beyond a reasonable doubt with respect to every element essential for conviction. We determine whether a rational factfinder could have found that each element of the crime was established beyond a reasonable doubt.

*State v. Kent*, 2006-NMCA-134, ¶ 10, 140 N.M. 606, 145 P.3d 86 (citations omitted). "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. The question is whether the trial court's "decision is supported by substantial evidence, not whether the court could have reached a different conclusion." *In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 15, 121 N.M. 562, 915 P.2d 318.

The State presented evidence that Victim was invited by C.B. to a barbecue and to stay overnight at her house. Victim was very anxious to go to C.B.'s home, but

16

inexplicably she was very anxious to leave C.B.'s house the next morning. Victim's mother and aunt immediately noticed a change in her, in that she was back-talking and throwing tantrums. Victim's mother reported that Victim told her she did not have fun at C.B.'s house. A few weeks after the sleep-over, Victim was staying with her aunt when she began having tantrums. Her aunt testified that she offered to invite C.B. over, but Victim said no. In the evening when Victim was headed to bed, she tripped over some toys that she had left out. When her aunt told her that she should pick up the toys, she said okay and went into the bathroom. When she came out, she was acting nervous and scared. She told her aunt that she was afraid of Defendant because he was "kissing her in bad places."

Victim reported that, on the night of the sleep-over, after the barbecue was over, Victim and C.B. sat on Defendant's lap while they watched a movie. Victim and C.B. slept in the same twin bed that night. Victim testified that she woke up during the night because she felt someone removing her pants and underpants. She recognized Defendant as the person pulling off her clothes. Victim felt Defendant touch her privates with his mouth and testified that he was licking her. She told Defendant to stop, and he did. Defendant pulled up her clothes, apologized, and asked her not to tell on him because he really did not want to go to prison. He left and came back with a cat. He told her she could pet the "kitty," and then he kissed her forehead. Victim

17

testified that, when she woke up, she saw the kitty and knew she had not been dreaming. C.B. testified that she did not wake up during the night and did not see anything happen. At trial, Victim reported that what she meant by "privates" is the front part of her body that is usually covered by a bathing suit. She was shown an exhibit depicting a figure with an "X" marked in the general pelvic area and with "v[a]gina" written under the figure. She identified the exhibit as a picture drawn by "[t]he lady who interviewed [her]" and stated that she had been asked to mark the picture where Defendant had touched her. The exhibit was admitted without objection.

Defendant moved for a directed verdict, arguing that the State failed to introduce evidence to elaborate on "the specific nature" of the touching. The court denied the motion. We agree with the district court's ruling. Victim told her aunt that Defendant had kissed her "in bad places." Victim testified that Defendant licked her "privates" and described the area that he licked as the front of her body that a bathing suit covers. She also marked the area that Defendant touched on an exhibit that was admitted at trial. Based on the evidence presented at trial, the jury could determine beyond a reasonable doubt that Defendant touched the edge or inside of Victim's female sex organ with his lips or tongue. There was sufficient evidence to support Defendant's conviction.

18

As a final matter unrelated to our above analysis, we express deep concern about the district court's statements at the May 21, 2007 hearing on Defendant's motion to continue.

> Well, I gotta say to you I've read [*State v. Newman*], and personally I think that's just a terrible decision, but it's not my decision. It's the Court of Appeals decision, as is [*Campbell*]. And both opinions, and again for the life of me I can't figure it out, . . . presumably we ought to just do away with the jury system and get the . . . psychologists and counselors up here and let them decide this case.

> Because to this day I probably wouldn't let them do what they did in the [*Newman*] case. I wouldn't let the State come in and present that type of evidence, and I don't think it's fair to the State to allow psychologists and psychiatrists to come in and say well, this person fits that profile or that witness may be probably not telling the truth because of these studies we've done.

> . . . .

> And, of course, that's always the defense in a CSP case, isn't it? The child's not telling the truth. What other defense is there? And now we got another defense. Well, the same defense . . . and I'll tell you, if the [*Campbell*] case had been . . . around for a long time, I wouldn't have any problem with this motion.

> . . . .

> But I will say to . . . Defendant until the Supreme Court either denies [certiorari], dismisses [certiorari], or grants [certiorari], I'm not going to follow *Campbell,* I'm just not. And I think I have . . . that prerogative and I don't understand why they keep publishing these decisions, because I have relied on them, and find out later that they are on cert[iorari] and the . . . Supreme Court overturns the case.

19

And so for the record, I would say to you that I would not follow [*Campbell*] in this case. And if the same facts that were stipulated to are stated in the [*Campbell*] case was stated before me, and I assumed that . . . Defendant would do that, although we don't know what . . . Dr. Pardee would say, I still wouldn't let it in. I just wouldn't. I mean, it's kind of gotten crazy.

A district judge should conduct proceedings with dignity and respect for the judicial process. Rule 21-200(A) NMRA ("A judge *shall respect and comply with the law* and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." (emphasis added)). The district judge's choice "for the record" to ignore the law is immensely troubling. The Court of Appeals has appellate jurisdiction in criminal proceedings to ensure the integrity, fairness, and protection of the citizens of New Mexico. N.M. Const. art. VI, § 29; NMSA 1978, § 34-5-8(A)(3) (1983); NMSA 1978, § 39-3-3(A) (1972); Rule 12-102(B) NMRA. Formal opinions from this Court are binding precedent. *State v. Jones*, 2010-NMSC-012, ¶ 59, 148 N.M. 1, 229 P.3d 474 0(noting that in the absence of law to the contrary, a decision from the Court of Appeals is "controlling" even when certiorari has been granted by the Supreme Court). Litigants in the court system are entitled to rely on the certainty, uniformity, and predictability of the law. Our legal system is based on the principal that justice cannot be applied in a checkerboard fashion according to individual whims, but should be guided by the rule of law. "Further, a judge must maintain or even strive to enhance public confidence in the

20

integrity of the judiciary through his or her conduct or language. A judge should not engage in conduct or language calculated to erode public confidence." *In re Eastburn*, 1996-NMSC-011, ¶ 3, 121 N.M. 531, 914 P.2d 1028. Confidence in the integrity and impartiality of our judicial system would surely be eroded if judges refused to follow the law. *See id.* ¶ 19. While a sitting district judge may disagree with appellate authority, a judge must nevertheless lay aside his own opinion on the wisdom of the law and dispose of the cases before him in accordance with precedent. A lower court must not deviate from a superior court's precedent. *Alexander v. Delgado*, 84 N.M. 717, 718, 507 P.2d 778, 779 (1973) (recognizing that a lower court's reversal of a superior court's decision is "unsettling in the law which we ought to strive to make certain, and result in a disorderly judicial process"). Regardless of a district judge's personal view of appellate decisions, a formal opinion from this Court is the law, and a judge in an inferior court cannot disregard it.

**III. CONCLUSION**

For the reasons set forth in this Opinion, we affirm Defendant's conviction for first-degree CSP.

21

**IT IS SO ORDERED.**

_____
**ROBERT E. ROBLES, Judge**

**WE CONCUR:**

_____
**CELIA FOY CASTILLO, Judge**

_____
**TIMOTHY L. GARCIA, Judge**